Filed 3/30/15  P. v. Rizvi CA1/3
Received for posting 4/2/15
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MUJAHID WAQAR RIZVI,<br><br>        Defendant and Appellant. | A138370<br><br>(Contra Costa County<br>Super. Ct. No. 05-111371-5) |
| In re MUJAHID WAQAR RIZVI,<br><br>        on Habeas Corpus. | A142686 |

Defendant Mujahid Waqar Rizvi (Rizvi) was convicted by a jury of three counts of committing a sexual act with a child age 10 or younger in violation of Penal Code, section 288.7, subdivision (b), acquitted by the jury of committing a lewd act upon a child under age 14 (Pen. Code, § 288, subd. (a)), and was sentenced to 15 years to life in prison.  Rizvi committed the crimes on one day in June 2011, when he was 54 years old, against his nine-year-old niece, Jane Doe.

In this appeal, Rizvi contends that the court erred by discouraging the jury from requesting readbacks of trial testimony, and limiting cross-examination about Doe's sexual knowledge.  In his petition for habeas corpus, Rizvi argues that his counsel was

1

ineffective for failing to call witnesses who would testify that his character is not consistent with that of a child molester.[1]

Rizvi's arguments are well-presented, but we are not persuaded of any reversible error in his case. We affirm the judgment and deny the petition.

## I. BACKGROUND

Rizvi was married to Z. Rizvi (Z.). They have two adult daughters, F. and M., and a son, H., who was 10 years old at the time of the alleged crimes. Z.'s sister, S. A. (S.), is Doe's mother. S. her husband A. Sh. (A.) have two other children, Doe's older brother Sy. and a younger brother K.. At the time in question, Rizvi and Z. lived in Lafayette, and S. and A. lived in Walnut Creek. Z. and S. have a brother, F., who lived in Concord with his wife Q. and their children.

S. and A. worked in a family business at a Baskin Robbins in Danville. On May 15 or 16, 2011, A. left home and went to the East Coast. As detailed further below, conflicting evidence was presented as to whether, when A. left, he was abandoning the family or looking for better work. After A. left, S., Doe, and Doe's brothers stayed with Z. and Rizvi during the week, and with F. and Q. on the weekends.

Doe was 11 years old when she testified at trial. She said that Rizvi drove her to the Baskin Robbins from his Lafayette home on a Monday in June 2011. She said that while she was sitting in the front passenger seat Rizvi put a coat over her legs, put his finger under her shorts into the private part where she peed, and moved his finger around inside her. He asked her whether it felt good or she did not like it. They stayed at the Baskin Robbins for five or ten minutes, and then drove to her family's home in Walnut Creek. S. testified that Rizvi had agreed to get A.'s car fixed.

Doe testified that on the drive to Walnut Creek, Rizvi put his finger in her private part as he had done on the way to Danville. They got to her house, and when they went into the garage, he licked her fingers. Rizvi got on his knees while she stood in the

---

[1] We ordered the petition consolidated with the appeal, and deferred deciding whether to issue an order to show cause. We hereby grant the request in Rizvi's petition to take judicial notice of the record in this appeal.

2

garage, and again put his finger in her private and moved it around. They got into A.'s car, and he continued to penetrate her while he drove it to his home. Doe said that after what he did to her it hurt to urinate.

Doe testified to another incident that was the basis for the lewd act charge. It allegedly occurred one morning a day or two before the acts just described, in the bedroom at Rizvi's house where she slept with her brothers and S. Doe said that Rizvi came into the room while her brothers were asleep after S. left for work, and "started doing weird things. Like licking my leg or something. And I think he kissed my butt." Although, she admitted that she did not remember this incident well.

Doe testified that, two or three days after the incidents during the drive to Baskin Robbins, she told Rizvi's son H. "the basic stuff" about what Rizvi had done to her, and asked H. if Rizvi "ever did anything to him." H., age 12 at trial, testified that Doe told him "that my father was touching her in an uncomfortably bad way and she didn't like it, and she asked me what to do." H. said he told Doe to ask Rizvi to stop. He said, "I learned that in my Boy Scouts when I read the safety handouts that they gave to us." Doe testified that, later that day, she told Rizvi "that he needed to stop." They were in the hallway of Rizvi's house, H. was coming out of his bedroom into the hallway, and Rizvi said, "shh." H. testified that he heard Doe ask Rizvi to stop, and that Rizvi replied, "All right."

S. testified that Doe told her about the molestations on July 1, when they were staying with F. and Q. in Concord. S. reported the molestations to Rizvi's wife Z. that night. S., Z., and Rizvi's daughter M. went to the police on July 4.

On July 5, H. was interviewed at the Lafayette Police Department. The interview was audiotaped, and the tape was played for the jury. H. said that Doe asked him "has your dad ever like . . . touched you or kissed you in these places? And I'm like no. And she's like he's been doing it to me. And she like, what should I do? And . . . I didn't believe her because um usually she lies about stuff but this time I don't think she would lie about that. So I . . . said are you . . . telling the truth? She said yeah. I asked her again multiple times and she said yeah every time. I'm like if he's doing this tell him . . .

3

loud and clear to just stop it." A few minutes later, H. saw Doe "at the end of the hallway in my house talking with my dad and she was [sort of] like mumbling so I couldn't hear what . . . she said but it sounded like can you please stop from doing this and then . . . my dad . . . said okay I'll stop . . . ." H. was asked whether this conversation occurred in the hallway or the garage, and he reiterated that it happened in the hallway.

On July 5, Doe was interviewed at the Martinez Children's Interview Center. The interview was videotaped, and the tape was played for the jury. Doe's account of the molestations and direction to Rizvi to stop was generally consistent with her trial testimony, although she did not remember at trial that Rizvi kissed her butt and private part when they were in the garage in Walnut Creek as she reported in the interview.

Rizvi denied that he molested Doe. Rizvi testified that S. told him on May 13 that A. was threatening to leave and divorce her because she was not being respectful to his mother and sister. On May 14, A. told Rizvi "I've had enough," and he left home the next day. A. had been managing the Baskin Robbins. A. told Rizvi that he did not care about the business, and the store was closed for two and a half days after he left. Rizvi testified that S., Doe, and her brothers were sad and depressed after A. abandoned them. Doe told him at a family gathering that she missed A. and said, "if I hurt myself, he'd be back." A. returned home two days after learning of Doe's allegations.

A. testified that he went to Virginia and Washington D.C. to look for work because he was not making enough money at the Baskin Robbins. He denied that he abandoned the family or told S. he wanted a divorce. When he spoke with Doe on the phone while he was away, he told her that he would arrange for the family to join him if he found work, and that he would return home in one and a half to three months if he did not. Z. testified that S. never said A. wanted a divorce. Z. said she told the police that S. and A. fought because S. "didn't want him to leave in May, she wanted him to leave a little later." S. testified that she and the children "never wanted to go with [A.] and we wanted to stay over here, and later on we decided that we should go."

Doe denied that A. had abandoned the family. She denied asking Rizvi whether A. would return if she got hurt, saying, "No. Why would I ask him that?" Doe was

4

asked, "[D]id you make up what you told us about your uncle so that your dad would come back?" She answered, "No. Why would I do that? That's a very bad thing to do. That's very serious."

Rizvi's older sister R. Rizvi (R.), testified for the defense that when her 22-year-old daughter Sa. Za. (Sa.) was nine or ten years old, Sa. stayed at Rizvi's house three or four hours after school. R. saw Rizvi during this time because he returned home from work around the time she would pick up her daughter. R. said that she never saw Rizvi behave inappropriately with a child. Rizvi's 18-year-old niece, T. Fatima, testified that she lived with Rizvi for about a year when she was eight or nine years old. She said he always behaved appropriately with her, but she could not remember ever being alone with him.

Rizvi testified that he had been a nervous driver ever since he got into a rollover accident in 1987. R., who was riding in the car when the accident occurred, said that he was especially nervous driving on freeways. Rhonda Carlson testified that Rizvi had been her boss for most of 25 years and that he drives "like a little old lady," "with both hands on the steering wheel . . . ." This testimony led to cross-examination about Rizvi's driving record, which included multiple accidents and citations.

When Rizvi's wife, Z., Doe's mother, S., and M. went to the police on July 4, Z. and S., assisted by M. as an Urdu interpreter, were interviewed by Contra Costa Sheriff Adam Hernandez. Called as a defense witness, Hernandez testified that Z. told him A. had abandoned Doe's family. Z. said H. told her that when he heard Doe tell Rizvi, "[n]o, stop it," Doe and Rizvi were in the garage of his home, not the hallway, and he did not see them. S. said Doe told her that the incident in the bedroom happened after, not before, the drive to Baskin Robbins, and that it happened in the middle of the night, not in the morning. S. said Doe told her that Rizvi was not on his knees when he molested her in the garage in Walnut Creek. Doe said he sat on a chair and had her stand over his face.

On cross-examination, Rizvi was asked, "You don't believe that [H.] would make up the situation where [Doe] came to talk to him, do you?" He answered, "No." He was asked, "[Y]ou do believe that [Doe] is a truthful child, don't you? A. Yes and no. Q.

5

And you have told other people that you believe that she's a truthful child; isn't that true?
A. Yes."

Presentation of evidence and arguments at trial took about three and a half days, and the jury deliberated for about one and a half days before reaching the verdicts.

## II. APPEAL (A138370)

A. <u>Instructional Issue</u>

Rizvi contends that the court's instructions improperly discouraged the jury from requesting readbacks of trial testimony.

(1) *Record*

At the beginning of trial, the court instructed the jury pursuant to CALCRIM No. 104 ("Evidence"): "The court reporter is making a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's record be read to you. You must accept the court reporter's record as accurate." After these standard instructions, the court added:

"But do not let the ability to request a readback of testimony at the end [of] the trial to substitute for listening carefully to the testimony while it is being given. There are two reasons for this: First, listening to words read off a page is not the same as observing a witness, including the demeanor and the way they speak when they testify. Second, readback is not automatic or quick. Trish [,the reporter in the courtroom,] is very good and the realtime transcript I get is very helpful, but there are mistranscriptions in it and it's not an official transcript. There are several steps that need to be taken before testimony can be read to you.

"To start with, the court reporters' supervisor must find another court reporter to take Trish's place here, because we likely will already be on the next trial. Then Trish must review and correct the notes so that the notes can be turned into a transcript that is complete and accurate. Then she must strip out all objections and rulings and matters stricken by the Court so that the transcript only contains testimony.

6

"Then the lawyers and I must review the transcript to make sure it is complete and responsive to your request.  Then Trish must go into the jury deliberation room and read the testimony to you.

"This can take hours, even days depending on how much readback you request.  I don't mean to dissuade you from asking for readback.  If you need it you will get it.  I simply ask you to recognize at the outset that the ability to ask for readback should not take place of paying careful attention during trial."

At the close of evidence, the court instructed the jury pursuant to CALCRIM No. 202 ("Note-Taking and Reading Back of Testimony"):  "You have been given notebooks and may have taken notes during the trial  You may use your notes during deliberations.  Your notes are for your own individual use to help you remember what happened during the trial.  Please keep in mind that your notes may be inaccurate or incomplete.  [¶] If there's a disagreement about the testimony and stipulations at trial, you may ask the court reporter's record be read to you.  It is the record that must guide your deliberations, not your notes.  You must accept the court reporter's record as accurate."

After these standard instructions, the court added:  "But please remember what I told you at the beginning of trial about readback.  If you need readback of testimony, we will provide it to you.  But please make sure . . . to make your request as limited as possible to meet your needs.  For example, if you were unclear about when Officer Jones turned on his siren, you would request testimony of Officer Jones about when he turned on his siren rather than the testimony about the siren or the testimony of Officer Jones. [¶] Everybody understand?  [¶] As narrow as possible."

The jury was given copies of the instructions, which included the court's supplemental instruction to CALCRIM Nos. 104 and 202.

The parties stipulated that "if read back is requested, counsel will be made aware of the request and have the opportunity to confer with the reporter before read back" and that "once approved, the court will confer with counsel over where it will take place."

According to a minute order, the jury was escorted to the deliberation room at 2:58 p.m on December 6, 2012.  The reporter's transcript for the day ended at 3:08 p.m.  At

3:30 p.m., the jury requested: "Transcript of [Doe's] testimony in court about bedroom incident, specifically about brothers sleeping in the room," and "Transcript of Z. on stand talking about H. saying '[Doe] got to ride in front seat. Why don't I get to ride in front seat[?]' "

The jury deliberated for a full day on December 10, and for two hours on December 11, and asked the court two questions during that time. Neither the minute orders nor the reporter's transcript through the time of jury deliberations mention the court's response to the December 6 transcript requests.

(2) *Review*

Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." "Pursuant to section 1138, the jury has a right to rehear testimony and instructions on request during its deliberations. . . . [A] violation of the statutory mandate implicates a defendant's right to a fair trial. . . ." (*People v. Frye* (1998) 18 Cal.4th 894, 1007, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Rizvi argues that the court's amplifications of CALCRIM Nos. 104 and 202 violated section 1138 and his constitutional rights to due process and a fair trial by coercing the jury into foregoing a request for a readback of testimony. He focuses on the portions of the instructions that detailed the steps required to prepare a readback, and the court's statement that the process could take "hours, even days"—a claim Rizvi views as "almost certainly an exaggeration." However, our Supreme Court has squarely held that "[m]erely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 506 (*Hillhouse*).) Accordingly we must reject Rizvi's challenge to the supplemented instructions.

8

*Hillhouse* upheld instructions regarding readbacks that were more "coercive" than those here. The trial court in *Hillhouse* told the jury " 'If you want readback of testimony, and I find it to be on a material point, then I'll direct the court reporter to go in and read back testimony. [¶] And when you ask for a witness' testimony to be read back, the entire testimony of that witness is read back so that everything is in context. . . . [¶] . . . And if you request it and I find it to be on a material point, you certainly will have that available to you.' " (*Hillhouse, supra*, 27 Cal.4th at p. 505, fn 5, italics omitted.) These instructions could have discouraged requests for readbacks because the court gave no guarantee that the requests would be honored. The court said the requests would be granted only if it found the testimony to be "material." Here, in contrast, the court assured the jury that it would receive any readback it requested. The defendant in *Hillhouse* argued that the instructions might have caused the jury to forego a readback of testimony from a witness whose testified at length, but the court rejected that argument with its holding as we have quoted.

In support of that holding, the *Hillhouse* court cited *People v. Anjell* (1979) 100 Cal.App.3d 189, 202–203 (*Anjell*). (*Hillhouse, supra*, 27 Cal.4th at pp. 506–507.) The jury in *Anjell* requested readbacks of testimony from three witnesses. In response, the court informed the jury that the readbacks would take from five and one-half to seven hours. (*Anjell, supra*, at p. 202, fn. 4.) The court continued: So you can see that if you add up those three you have got an awful lot of hours of testimony. Now that is not to say that you can't have that if that's what you need in your deliberations. . . . And what I am going to ask you to do is retire to the jury room and have a discussion as to what you need and then you write me another note and let me know and whatever it is that the jury decides they need, that's what you're entitled to have if you need it . . . ." (*Ibid.*, italics omitted.) The jury returned a verdict an hour and a half later, without requesting a readback of testimony.

The court found that "[a] fair reading of the [instructions] . . . show[ed] no violation of section 1138. They went no further than to inform the jurors of the time involved in rereading the requested testimony, so that they could make a knowledgeable

9

decision as to whether they desired to hear it.  The court did not attempt to discourage a reading, and in fact emphasized that the jurors were 'entitled' to have the testimony reread if they felt it was needed."  (*Anjell*, *supra*, 100 Cal.App.3d at pp. 202–203.)  Likewise here, as a whole the instructions were not improperly coercive.  The court explained that it was not trying to dissuade readback requests, and twice told the jury that any such requests would be granted.

Rizvi's instructional argument fails under *Hillhouse* and *Anjell*.

B.  Evidentiary Issue

Rizvi contends that the court erroneously limited defense cross-examination concerning Doe's sexual knowledge.

(1)  *Record*

Before trial, defense investigators obtained statements from Rizvi's relatives that Doe and her brothers had watched inappropriate television programming.  Rizvi's brother, Agha Rizvi (Agha) recalled Rizvi telling him this before he was arrested.  R.'s husband said his wife told him that Z. said Doe and her brothers "watched inappropriate movies (sexually explicit) or TV shows . . . through Netflix on an account their father A. had given them the pass code."  R. said Z. "complained A. was a bad father for giving his password for adult movies to one of the children.  R. stated, according to Z., the children were continually watching adult movies.  R. was not clear, but either Z. or S. had made A. change his password so the children could no longer access the adult movies."

The prosecution filed a motion in limine to exclude on hearsay, foundational, and Evidence Code section 352 grounds "questioning on an allegation that S. and/or A. . . . allowed one, some, or all of her children to watch pornography on Netflix and/or Z.['s] . . . concern over the children having access to pornography . . . ."  The motion stated that Z. "denies that the children have watched pornographic material, acknowledges that S.'s oldest son does know the Netflix account number, and denies complaining to any witness about the children watching sexualized movies."

When the motion was argued, the prosecution told the court that the defense planned to explore whether Doe had seen the movie *Precious*, and objected on the ground

10

that the acts in question in the case—"oral copulation, digital penetration, and licking of the legs"—were not depicted in the movie. The court stated: "The child's sexual knowledge and exposure to the particular types of acts at issue here is a fair area for inquiry to rebut any suggestion that a child of this age would not know of such acts or invent them unless they happen." However, the court told defense counsel, "unless you have specific information, not just that the brother may have had the Netflix password, but in fact that this particular complaining witness witnessed particular acts . . . I think it would be unduly consumptive of time and confusing to the jury and inviting speculation to say that because her brother had access to the Netflix password and they may have watched a movie that the parents didn't know they were watching, and, therefore, she must have had exposure to these kinds of activities . . . ."

Defense counsel responded: "I'm going to ask her open-ended questions about her sexual knowledge. Had she ever heard of anything like this before the time she made the accusation. If so, where? We may find out that there was another movie we don't even know about or her mother told her or it was discussed with her little friends. I have to be able to cross-examine her." The prosecutor said she would not object to "narrowly tailored" questions such as, "Before this incident, did you know that anyone would put their mouths to the private parts of a person? . . . [¶] . . . But if she responds no, then . . . no further questioning should occur." The court said, "I think the questions, such as those that [the prosecutor] posited, are appropriate. Is this something you ever heard of before. If so, how? If not, then that's the answer."

The court then ruled as follows: "I think that what [defense counsel] is proposing is not, per se, inappropriate. I think it's appropriate to find out what this child had heard about, had perhaps even seen depictions of that relate to the conduct at issue here at the time of the incident alleged here. A fishing expedition about what movies they may have seen and a side story about kids getting in trouble for misusing the Netflix password is not particularly helpful, is confusing, is unduly consumptive of time and invites speculation. So unless she says in her testimony yes, on Netflix I saw somebody doing this to another person, if she said that in answer to an open-ended question, Did you ever

11

see anything like that on a movie, then you can get into it. Otherwise, the speculation about, Well, they must have seen pornography because they had the Netflix password, we're not going to get there."

Defense counsel then stated that Rizvi had "discovered them watching *Precious* and they were reprimanded and got in trouble for it. [¶] . . . [¶] I'm looking at a separate issue of anger towards my client for what he did." Counsel said, "I'm not married to the movie *Precious*. It is the fact that . . . she was upset about being turned in to her aunt, her mother and her father were called, and shortly thereafter they had this allegation." The court ruled that "any motivation[s] that the complaining witness [had] to fabricate are fair game. . . . [¶] . . . I don't want to get the whole *Precious* issue in this case unless there's something in *Precious* that really suggests exposure to the kinds of conduct alleged here. If you want to ask . . . were she and the other kids caught watching a movie they weren't supposed to watch and got in trouble for that because the defendant told her father, I think that's okay."

The prosecutor objected, "If you're going to allow the question of were you caught watching movies that you shouldn't have been watching, it invites this jury to speculate as to how bad that movie was." The court told the prosecutor, "I'd have to disagree with you on that one. . . . [¶] . . . I'm ordering [defense counsel] not to ask the question in such a way that it suggests what the content of the movie was." The prosecutor continued to protest "it's going to be open for speculation to this jury as to what kind of movies the defendant was disciplining the children for watching. The court said, "[T]he question has to be phrased in such a way that it's content neutral. So it's not a question about, Did you watch pornography? Did you watch something that was sexually suggestive that you weren't supposed [to]? It's simply, Were you caught watching a movie in a setting where you weren't supposed to and did you get in trouble for that?"

During Doe's cross-examination, defense counsel asked whether she had ever gotten in trouble with Rizvi for watching movies on Netflix, and she answered, "No. Wait—I never watch Netflix." She said that her brother did not have the password to the family's Netflix account. The following exchanges ensued: "Q. . . . [Y]ou watch TV,

12

right? [¶] A. Yeah. I watch TV, like kid shows. [¶] Q. And the TV's on sometimes when parents are watching TV? A. My parents don't watch anything inappropriate. [¶] Q. Have you ever heard the word 'molestation' prior to the time you made the allegations in this case? . . . [¶] A. Do I have to answer this? [¶] The Court: Yes, just have you ever heard the word. [¶] [A.] No. Like, I don't think so."

H. testified on cross-examination that Rizvi caught him, Doe, and Doe's older brother Sy. watching Netflix. He said that his parents controlled the programs he watched, and that he got in trouble because he was on Netflix and his parents were not monitoring what he was watching.

Discussion of Netflix and Doe's movie watching resumed with the court after the People rested their case. Defense counsel stated: "I wanted to ask [Doe] what was watched to see her sexual knowledge, but the Court said I wasn't allowed to. [¶] . . . [¶] I felt the Court's ruling was too narrow, that I should have been able to ask her what movies have you watched, but I abided by the Court's ruling." In response to those comments, the court reviewed the transcript of its ruling that the defense could ask Doe whether she had seen any of the sexual acts she reported in a movie, and said to defense counsel, "I didn't remember that I shut you down completely, and, in fact, I did not." Defense counsel then noted that Doe's watching Netflix programs was relevant to the extent that Rizvi got her in trouble for that conduct and thus gave her a motive to falsely accuse him. The court said, "[A]gain, I'm not shutting you down. I've let you go into the Netflix stuff, but only on . . . the issue of [Doe's] motivation. So that unless . . . she felt that she had been wronged by [Rizvi] in connection with this, it's all a sideshow."

In the defense case, A. testified that he had a Netflix account, and gave the password only to Rizvi and Z. Z. testified that Doe's brother Sy. also had the password, but Sy. testified that he did not. Sy. remembered Rizvi coming into the room to see whether he, H., and Doe were watching movies on Netflix, but did not recall Rizvi getting upset with them on those occasions. Rizvi testified that he saw Sy., H., and Doe watching Netflix and that he called A. and asked him to change the password.

13

In closing argument, the defense maintained that Doe and H.'s conflicting testimony about being caught watching Netflix, and Z. and Sy.'s conflicting testimony about Sy. having a password, showed that the witnesses supporting Doe "all lie." Defense counsel next argued that Doe was not credible in denying that she had ever heard the word "molest" before she made her allegations against Rizvi. The prosecutor responded that the Netflix evidence was relevant if at all on issues of credibility, and said, "[Y]ou can't speculate and try to intermix it like defense counsel did with what [Doe] knew or didn't know. Nice try."

(2) *Review*

Rizvi contends that the court improperly limited his cross-examination of Doe concerning possible sources of her sexual knowledge. "A child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts. This is because knowledge of such acts may be unexpected in a child who had not been subjected to them." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757.) To rebut the inference that the complaining witness must have gained knowledge of sex through the defendant's acts, the defense may elicit evidence about other possible sources of that knowledge. (*Ibid.*)

The trial court here drew a line between Doe's prior exposure to the specific acts of molestation she alleged and her prior exposure to other sexual matters. The court ruled under Evidence Code section 352 that evidence of Doe's prior knowledge of the acts she alleged, including knowledge gained from movies, was admissible, but that evidence of her knowledge of other sexual activities was not. Rizvi argues that he should have been permitted to ask Doe whether she had seen *Precious* "or any other movies with sexual themes," and he submits "[t]hat *Precious* did not depict the identical sexual acts as those alleged by [Doe] is immaterial."

A court has " 'broad discretion' under Evidence Code section 352 'to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." ' " (*People v. Merriman* (2014) 60

14

Cal.4th 1, 60.) "An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Id.* at p. 74; see *People v. Vargas* (2001) 91 Cal.App.4th 506, 543, 545 [trial courts "have wide discretion in determining the relevancy of evidence"; no abuse of discretion under Evid. Code, § 352 unless court " ' "exceeds the bounds of reason, all of the circumstances considered" ' "].)

The line the court drew in this case was a reasonable one. Doe's prior knowledge of the acts she alleged was directly relevant to the veracity of her charges. Her exposure to other sexual matters was not. The court could reasonably conclude that the probative value of evidence of Doe's having watched movies with "sexual themes" other than sodomy and oral copulation would be substantially outweighed by the probability that such evidence would create a substantial danger "of confusing the issues." (Evid. Code, § 352.) Accordingly, there was no abuse of discretion under Evidence Code section 352, and no violation of Rizvi's constitutional rights (see, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 503 [discretionary evidentiary ruling did not violate right to present a defense]; *People v. Gurule* (2002) 28 Cal.4th 557, 620 [ordinary rules of evidence generally do not infringe on the right to present a defense; rejecting argument that restricted cross-examination violated rights to confrontation, due process, and a fair trial]; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of defense evidence on a subsidiary point is not a deprivation of due process]).

Nor was there any prospect of prejudice from the court's ruling. Rizvi fairly observes that Doe was defensive on the stand when she was questioned about what she had watched on TV and whether she had heard the word "molestation" before she accused him of sexual conduct. Given that testimony, Rizvi is likely correct that Doe would have denied watching "adult-oriented movies" if she had been questioned along those lines. Rizvi argues that if Doe "denied watching *Precious* or other adult-oriented movies on television, defense counsel could have followed up by eliciting evidence from

15

H. about the specific movies they had watched together. By so doing, counsel would have accomplished two objectives at once: he would have demonstrated an alternative source for [Doe's] precocious sexual knowledge and he would have proved that she lied in her trial testimony. [¶] As a result of the trial court's ruling, [Doe's] testimony took on a false air of veracity—as defense counsel was unable to show that she was being coy about her exposure to sexually-oriented movies and television shows."

This reasoning greatly exaggerates the potential effect of the excluded evidence. Doe's defensiveness about what she watched on television gave the defense room to argue that she was being untruthful about her exposure to sexually-oriented programs, and one more negative response from her would not have significantly strengthened that argument. The defense was able to call Doe a liar because H. said Doe had watched something on Netflix and Doe said she did not. Any further conflicting testimony by the two about what they had seen on TV would merely have provided cumulative impeachment on the same subject. There is no reasonable probability that the excluded evidence would have affected the outcome. (Evid. Code, § 354 [exclusion of evidence is prejudicial only if it causes a miscarriage of justice]; see also *People v. Whisenhunt* (2008) 44 Cal.4th 174, 208 [" 'limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted' "].)

### III. PETITION (A142686)

In his habeas corpus petition Rizvi argues that his counsel was incompetent because he failed to raise a "*Stoll* defense," in which expert testimony is presented to provide circumstantial character evidence that the defendant did not commit the charged offenses because he or she does not fit the profile of a child molester. (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1161 (*Stoll*).)

A. <u>Legal Standards</u>

"The law governing [an ineffective assistance of counsel] claim is settled. 'A criminal defendant is guaranteed the right to the assistance of counsel by both the state

16

and federal Constitutions.  [Citations.] "Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." ' [Citation.] It is [a] defendant's burden to demonstrate the inadequacy of trial counsel.  [Citation.] . . . ' "In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citation.]  [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.)

B.  Expert Testimony

After the verdicts were rendered and before the sentencing hearing, the defense obtained a psychological evaluation of Rizvi from Dr. John Kincaid.  Dr. Kincaid interviewed and tested Rizvi for over six hours, and concluded that he was "at low risk for recidivism" and "a strong candidate for probation."  A Rorschach test suggested that Rizvi might have "a tendency toward impulsive outbursts of unwarranted emotion and/or ill-advised behavior." However, his scores on an HSAQ-SV test assessing sexual interest in children "suggest[ed] that he **does not** find children sexy, nor does he endorse attitudes of sexual entitlement."  His zero score on a STATIC-2002R test predicting future risk of sexual re-offense on a scale of -2 to 13 put him in "the Low Risk category."

While this appeal was pending, the defense obtained a psychological evaluation of Rizvi from Dr. Steven Barron, which is attached as an exhibit to the petition.  Dr. Barron interviewed and tested Rizvi for four and one half hours, and found "little indication . . . that Mr. Rizvi was predisposed to commit a sexual offense against a child."  Rizvi's minus one score on the Static-99R test predicting sexual recidivism put him in the "Low

Risk Category," with an estimated 2.1 percent risk of reoffending over five years. He was given the MSII Adult Male Form test, "designed to measure the sexual characteristics of an adult male alleged to have committed a sex offense or sexual misconduct. . . ." His "highly defensive" responses on the "Dissimulation Scale" and "Sexual Denier Scale" were "either a defensive attempt to demonstrate he has no sexual problems, or reflect[ed] actually held hypercritical sexual attitudes [possibly] influenced by his religiously conservative background." The Stable- 2007 test, which measures "stable dynamic risk factors" showed "no static factors present that increase his risk for sexual offending. . . . As for dynamic factors, there was little indication of overarching personality characteristics, skill deficits, or learned behaviors that relate to risk for sexual offending."

Dr. Barron acknowledged that his test results were "in large part reliant on Mr. Rizvi's self-report. Use of objective sexual interest measures, such as the penile plethysmograph and/or the Able Assessment for Sexual Interest" could have permitted "a more definitive opinion as these measures are less susceptible to attempts by the examinee to manage their presentation." However, prison policy prohibited display of the images of children and adults used in these tests to measure sexual arousal. Dr. Barron noted that these tests could have been administered to Rizvi in an outpatient setting while he was awaiting trial.[2]

Also attached to Rizvi's petition is the declaration of Benjamin Rice, a criminal defense attorney for 33 years who had represented clients in over 75 jury trials, including homicide and sex cases. In Rice's view, *Stoll* expert evidence, "when it exists in a case," is "a keystone element of defense" because "it provides objective support for a defendant's assertions of innocence." He opined that effective appointed trial counsel would have requested funds for *Stoll* psychological testing where, as here, the defendant

---

[2] When restrictions on Rizvi's movements while on bail were discussed in connection with Rizvi's custody credits, the prosecutor stated that "he was given wide latitude . . . to be able to go where he wanted to go."

faces life in prison, has no prior sex offenses, is charged with crimes against a single victim, and continuously and consistently professes his innocence.

Rizvi's trial counsel, Patrick Clancy, executed a declaration, attached as an exhibit to an addendum to the habeas petition, stating that his decision not to retain a *Stoll* expert "was a conscious tactical choice." He discussed the decision with Rizvi and Rizvi agreed with it. Based on his 36 years of experience working almost exclusively on sex offense cases, Clancy said, "I have come to find *Stoll* experts have a weak scientific basis for their opinions which is easily impeached through cross-examination." He said, "In my years of debriefing juries I have found that juries are highly suspect of 'bought and paid for testimony' from psychiatrist[s] and psychologist[s]." Clancy was also concerned that his use of *Stoll* testimony could have led the court to order, under Penal Code section 1054.3, that Rizvi be evaluated by a mental health expert selected by the prosecution, with potentially adverse consequences to the defense. (See Pen. Code, § 1054.3, subd. (b)(1) [court may order defendant to submit to examination by a prosecution-retained mental heath expert if the defendant places his or her "mental state" in issue through proposed mental health expert testimony].)

Clancy's declaration established that he rejected use of a *Stoll* defense based on years of experience showing that the defense was scientifically weak, easily impeached, and viewed by juries with suspicion. Rizvi argues that "such a one-size-fits-all approach becomes unreasonable where it ignore[s] the unique peculiarities of a given case. In light of [his] age and spotless character and background, his case almost screamed out for a *Stoll* expert." But even if there were good reasons for presenting a *Stoll* defense in this case it does not mean there were no good reasons not to do it. Defense counsel made a deliberate tactical decision and articulated reasonable grounds to support it. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable" (*Strickland v. Washington* (1984) 466 U.S. 668, 689), and we decline to reach that conclusion here. Rizvi's disagreement with his trial counsel's tactics is insufficient to overcome ' "the

19

strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' " (*People v. Lucas*, *supra*, 12 Cal.4th at p. 437.)[3]

C. Lay Testimony

Rizvi contends that his counsel was ineffective because he failed to call additional lay witnesses to testify to his good character with children. (Evid. Code, § 1102, subd. (a) [allowing admission of such evidence].) As we have noted, Rizvi called two such witnesses, his sister R. and his niece T. Fatima, who testified about Rizvi's behavior toward girls of Doe's age.

In his declaration in connection with the habeas petition, counsel stated: "It is my opinion that the use of lay witnesses on the issue of *Stoll* character carries greater weight with the jury than expert testimony on the same issue. Lay witnesses were interviewed and prepared to testify in the Rizvi trial. The DA opposed most of the lay witnesses on the grounds that they were not the same age as the alleged victim at the time they were around Mr. Rizvi. The court agreed and limited my pool of *Stoll* lay character witnesses to witnesses that were around the same age as the alleged victim at the time that the witness was around Mr. Rizvi. [¶] . . . Mr. Rizvi's pool of good *Stoll* character witnesses was severely limited. His wife, Z., aligned herself in the case against her husband and with her niece . . . . Z. testified at a bail hearing about Mr. Rizvi's devious character and lack of trustworthiness. His two adult daughters had also aligned themselves with the mother's side of the family and against Mr. Rizvi. Both daughters refused to be

_____

[3] In view of this conclusion, we need not decide whether, as Rizvi claims, there was no basis for counsel's concern about the potential for a court-ordered examination by a prosecution expert under Penal Code section 1054.3, subdivision (b). Rizvi notes that no reported case has permitted the prosecutor to retain an expert under this statute in response to expert testimony under *Stoll*, but the apparent absence of any case law on point does not establish that counsel's concern was unfounded. Rizvi submits that *Stoll* testimony would have put his character at issue, not his mental state, but it is not clear that this is an operative distinction under the statute. (See *Stoll*, *supra*, 45 Cal.3d at pp. 1166–1167 (dis. opn. of Lucas, C.J.) ["acknowledge[ing] that California courts have allowed expert opinion on the subject of a defendant's mental state, including character evidence indicating the likelihood that he could not have committed the charged offenses"].)

20

interviewed by my investigator.  I could not put onto the stand to testify witnesses that I did not know what they would say on the stand."

Rizvi observes that, contrary to counsel's declaration, the court did not definitively limit lay character testimony to his behavior with children of Doe's age.  When the subject was discussed early in the trial, the court said that testimony concerning children over age 14 was "potentially" excludable.  However, a ruling on the point was deferred, and none was thereafter sought.  Rizvi dismisses counsel's discussion of testimony from his wife and daughters as a "red herring" because he has never suggested that they should have been called as character witnesses for the defense.

Before he was sentenced, Rizvi filed about 60 letters of support attesting to his good character, mostly from family members, coworkers at Copy Central in Berkeley where he had worked for nearly 30 years, and U.C. Berkeley faculty and associates who knew him through his work.  Rizvi argues that some of these individuals, in particular his work colleagues, Rhonda Carlson and Craig Fairbanks, and his brother Agha, should have been called to attest to his good character with children.

Fairbanks, the chief executive officer of Copy Central, hired Rizvi and worked with him for nearly 30 years.  Fairbanks wrote:  "So far as I [k]now, [Rizvi] has never been accused of any inappropriate sexual behavior of any kind and I would not have and still wouldn't have hesitated to leave him alone with my daughters."

Agha wrote that he had been confined to a wheelchair for 50 years after suffering a spinal injury, and had been on dialysis since 1999 when his kidneys failed.  He described the extensive care Rizvi had given him throughout his life.  Agha stated that Rizvi "has supported me physically, emotionally and financially.  He was to me my eyes, ears, my arms and legs.  He became  a perfect substitute for my physical short comings. He is essential to my survival.  Your honor, without him I find myself totally helpless and my survival in his absence will be very difficult, almost impossible."  Agha said, "No one I know believes that [Rizvi] can do anything heinous or abhorrent."

Carlson, who testified at trial about Rizvi's driving rather than his character with children, wrote that before she worked at Copy Central, she was director of the Child

Assault Prevention Project at Bay Area Women Against Rape in Oakland. She said her son and daughter had suffered child sexual abuse. She stated: "I have seen [Rizvi] with my own children and his children and children of families he's close to. I've been around men who make my sensors go off. [Rizvi] is not one of them! I've seen [Rizvi] hugging children and kissing children and putting them on his lap. Not one of them reacted in any way that made me wonder."

We find no reasonable probability that character evidence from any of these three witnesses would have led to a different outcome. Carlson was impeached at trial with admissions that Rizvi employed both her and her son, and could cause them to be fired. Agha could have been impeached with his great dependence on Rizvi for care and support. Fairbanks said he would not have hesitated to leave Rizvi alone with his daughters, but he did not say that he or anyone he knew had ever in fact done so.

We have reviewed the other letters from individuals Rizvi identifies as potential witnesses concerning his character with children, and are not persuaded that testimony from any of these individuals would have changed the verdicts, either. The letters from T. Fatima's parents and older sisters did not suggest that their testimony would have added anything material to the testimony F. provided. Rizvi's older brother Abbas wrote that he had a 29-year-old daughter and a 24-year-old son who loved Rizvi and said "he did not do anything to them," but the extent of Rizvi's contact with them when they were around Doe's age is not apparent. Others who wrote in Rizvi's support stated only that they had worked or socialized with Rizvi and had not seen or heard of any impropriety on his part in those contexts.

Thus, even if counsel could be faulted for failing to present additional lay character testimony, we are unable to conclude that the omission was prejudicial.

## IV. DISPOSITION

The judgment is affirmed. The petition for a writ of habeas corpus is summarily denied. (See *People v. Romero* (1994) 8 Cal.4th 728, 737.)

22

_____
Siggins, J.

We concur:


_____
McGuiness, P.J.


_____
Pollak, J.